M. E. SANDSBERRY, JR. ET AL AND GULF, COLORADO AND SANTA FE RAILWAY COMPANY ET AL V. INTERNATIONAL ASSOCIATION OF MACHINISTS ET AL.*

No. A-5061. Decided July 25, 1956.
Rehearing Overruled December 5, 1956.
(295 S.W. 2d Series 412)

*Certiorai to Supreme Court of the United States denied. 353 U.S. 918, 77 Sup. Ct. 669, 1 L. Ed. 2d 665.

*Simpson, Clayton & Fullingim, A. J. Folley, E. A. Simpson,* and *Lewis Jeffrey,* all of Amarillo, *J. C. Gibson, R. S. Outlaw, Wm. J. Milroy,* and *C. G. Niebank,* all of Chicago, Ill., and *Preston Shirley,* of Galveston, for petitioners.

The Court of Civil Appeals erred in holding that the union shop statute and respondent unions' effort thereunder to procure the signing of the union shop contract do not constitute governmental action sufficient to raise constitutional questions under the Bill of Rights and in failing to hold that the union shop statute, and a union shop contract thereunder deprive petitioner employees of their right to work, freedom of speech, freedom of association, and their property, contrary to the First, Fifth and Ninth amendment to the Constitution of the United States. Grovey v. Townsend, 295 U.S. 45, 55 Sup. Ct. 622, 79 L.Ed. 680, 97 A.L.R. 680; Smith v. Allwright, 321 U.S. 649, 64 Sup. Ct. 757, 88 L.Ed 987; Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23.

*Schoene & Kramer* and *Edward J. Hickey, Jr.*, all of Washington, D. C., *Charles Morris*, of Dallas, *Mulholland, Robie & Hickey*, and *Donald W. Fisher*, all of Toledo, Ohio, for respondents.

Cited Underwood v. Texas & Pac. Ry. Co., 178 S.W. 38; Noble State Bank v. Haskell, 219 U.S. 104, 31 Sup. Ct. 186, 55 L.Ed. 112; Napier v. Atlantic Coast Line R. R. Co., 272 U.S. 605, 47 Sup. Ct. 207, 71 L.Ed. 432.

MR. JUSTICE CULVER delivered the opinion of the Court.

Certain employees of petitioner, Railway Company, instituted this suit for themselves and on behalf of all other employees similarly situated against Santa Fe Railway Company and sixteen non-operating railway labor unions to restrain them from entering into a union shop agreement, and to restrain and enjoin the unions from striking or using other economic force to compel Santa Fe to enter into such contract.

Santa Fe answered, consenting to the relief sought, and by cross-action against the unions, itself sought an injunction against the unions to restrain them from using economic force to compel a "union shop" contract. Judgment in the trial court resulted in favor of petitioner employees and Santa Fe, and the relief prayed for was granted. On appeal the Amarillo Court of Civil Appeals reversed and dissolved the injunction. 277 S.W. 2d 776.

The trial court concluded that Sec. 2 Eleventh of the Railway Labor Act as amended, 64 Stat. 1238, 45 U.S.C.A., Sec. 152, Eleventh,[1] known as the union shop statute is unconstitutional and void and therefore the Right-to-Work Statute, Art. 5207-a,

---

[1]"Eleventh. Nothwithstanding any other provisions of this chapter, or of any other statute or law of the United States, or Territory thereof, or of any State, any carrier or carriers as defined in this chapter and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted.

"(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class: *Provided*, That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member or with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to render the periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership.

Vernon's Ann. Civ. Stat., is applicable within the State of Texas forbidding the execution of any union shop contract that makes membership in a union a condition of employment between the parties. The United States Supreme Court in the recent case of Railway Employes' Dept. et al v. Hanson et al has held to the contrary. 351 U.S. 225, 100 L.Ed. 633, 76 Sup. Ct. 1044.

In their supplemental brief petitioners assert that under the issues and facts in this case the Hanson decision requires an affirmance of the trial court's judgment enjoining the execution of a union shop contract compelling full union membership and that the record here presents the constitutional issues which the court did not decide in the Hanson case for the reason that they were not brought before the court in that record.

The contract proposed by respondent unions to the Santa Fe was worded substantially in terms of the union shop statute and apparently similar in all respects to the contract under attack in Hanson. The nature of that contract is described by the court as follows:

"This is a suit brought in the Nebraska courts by employees of the Union Pacific Railroad Co. against that company and labor organizations representing various groups of employees of the railroad to enjoin the application and enforcement of a union shop agreement entered into between the railroad company and the labor organizations. Plaintiffs are not members of any of the defendant labor organizations and desire not to join. Under the terms of the union shop agreement all employees of the railroad, as a condition of their continued employment, must become members of the specified union within 60 days and thereafter maintain that membership. It is alleged that failure on their part to join the union will mean the loss of their employment together with seniority, retirement, pension, and other rights."

---

"(b) to make agreements providing for the deduction by such carrier or carriers from the wages of its or their employees in a craft or class and payment to the labor organization representing the craft or class of such employees, of any periodic dues, initiation fees, and assessments (not including fines and penalties) uniformly required as a condition of acquiring or retaining membership: *Provided*, That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective agreement, whichever occurs sooner."

"* * * *."

Petitioners vigorously urge that the proposed contract makes the absolute requirement that nonunion employees become full union members. But it no more requires full union membership than does the contract in Hanson and as expressly held in that case the conract does not compel full union membership.

The petitioners principally argue here that the record in our case shows many facts and circumstances that were not contained in the Hanson record, all of which bear, they say, on the practices of the unions, the requirements laid down in their constitutions and by-laws for membership, the disciplinary control exercised by the unions over their members, the obligations a member must assume and the unions' interpretation of the statutory requirements.

While this record does contain probably more factual data, for the most part, it would seem to be cumulative and amplified rather than distinctive. Basically, we think, evidence of the same facts was before the court in the Hanson case, for that decision quotes liberally in footnotes from the constitutions and by-laws of a number of the respondent unions that place certain restrictions upon the freedom of activity and expression of its members and provide, among other things, for compulsory dues and assessments to finance insurance and death benefit plans. A large part of petitioner's supplemental brief is devoted to a discussion of the provisions of these same constitutions and by-laws that were in the Hanson record and noted by the court.

The legislative history of the union shop amendment indicates an intention on the part of Congress only to eliminate the so-called "free rider problem." It was asserted in debate that the strife and dissatisfaction existed among the rank of the union members because of the fact that nonmembers received the benefit of representation without contributing their pro rata share of the bargaining expense. 96 Cong. Rec., p. 16374 et seq. Mr. Justice Douglas made this point in quoting from the remarks of Senator Hill who managed the bill on the floor of the Senate: "The question in this instance is whether those who enjoy the fruits and the benefits of the union should make a fair contribution to the support of the unions." Id. p. 16279.

■ Additionally, in our case it was shown that the union committee after making demand for a union shop contract, refused to discuss or consider changes to provide only for the payment of fees or charges to defray the permanent cost of collective

·bargaining. But a misconception on the part of the unions as to the effect of the union shop contract would not warrant us in upholding an injunction against the execution of that contract.

The testimony also reveals that in the past other railroads, after the execution of a similar union shop agreement, lost hundreds of employees by discharge or resignation. Some five or six witnesses testified that they had been discharged, two of them for refusing to take the oath of union membership. But regardless of any conditions for membership set forth in any union constitution or by-laws, or any discharges or resignations that have taken place as a result of the union shop contract on any other railroad lines, the membership requirements of this contract and of the union shop statute are merely formal and fictional aside from the financial obligation. Of course all of the resignations and discharges referred to above occurred before the Hanson decision and may have resulted as a misinterpretation of the legal effect of the contract. Both the statute and the contract expressly provide that the requirement of membership as a condition of employment shall not apply "to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees and assessments (not including fines and penalties) uniformly required as a condition of acquiring and retaining membership."

■ The Hanson opinion holds that "the enactment of the Federal statute authorizing union shop agreements is the governmental action on which the constitution operates." It also observes "that Congress endeavored to safeguard against that possibility, (i. e. that compulsory membership will be used to impair freedom of expression) by making explicit that no conditions to membership may be imposed except as respects 'periodic dues, initiation fees and assessments.' " The unwilling employee need assume no pledge of conformity nor promise of obedience, nor even make application for membership to retain employment under the union shop contract.

Although the Supreme Court in Hanson only held "that the requirement for financial support of the collective bargaining agency by all who received the benefits of its work is within the power of Congress under the commerce clause and does not violate either the First or Fifth Amendments," it upheld the union shop agreement theretofore entered into between the unions and the railroads, and left open the question as to any objection that may be raised to the use by the unions of these funds.

As to the matter of financial support petitioners say; "Perhaps the most decisive fact leading the Supreme Court of the United States to conclude that violation of the First and Fifth Amendments was not shown in the Hanson case was its inability to find upon the record in that case that the members' funds may be used to carry on political activities imposed by them." They cite from the record before us one or more instances of political assessments made by one of the defendant unions and discuss generally the political activity of union labor. They quote from union organs statements by union leaders of their intention, past and present, to support measures and candidates deemed favorable to their cause and the necessary implication is drawn that some union funds are and will be devoted to political activity.

■ We think a political assessment was not contemplated by the Congress in using the term "assessments" in the union shop statute, nor that failure to pay a political assessment would be a valid ground for discharge. But the contract has not been signed, no one has been discharged for refusal to pay any dues or assessments. Surely the United States Supreme Court in consideration of the Hanson case, if not otherwise, judicially knew of union political activity and that funds to carry on that activity are essential. We are of course bound by that decision and can say no more than "if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case."

The judgment of the Court of Civil Appeals dissolving the injunction must be affirmed.

Opinion delivered July 25, 1956.

Mr. Justice Calvert Concurring.

My purpose in filing this opinion is to express my apprehension concerning those portions of the majority opinion which undertake at this time to interpret an unexecuted contract and to define judicially, in advance, certain rights of the parties under the contract. I refer specifically to the following statements: "* * * the membership requirement of this contract and of the union shop statute are merely formal and fictional aside from the financial obligation. * * * The unwilling employee need assume no pledge of conformity nor promise of obedience, nor even make application for membership to retain employment un-

der the union shop contract. * * * We think a political assessment was not contemplated by the Congress in using the term 'assessments' in the union shop statute, nor that the failure to pay a political assessment would be a ground for discharge."

It is my view that the foregoing issues are prematurely raised and prematurely decided. A question certain to be raised hereafter is whether the quoted rulings are pure obiter dicta or whether they are res adjudicata of the matters there decided. I do not mean to indicate that I would disagree with most of what has been said on the issues if they were here; I simply disagree that they are here.

In passing I point out that what has been said with respect to the rights of the parties to a contract made pursuant to paragraph (a) of Sec. 2 Eleventh leaves little, if any, difference in the meaning of that paragraph and paragraph (b) of Sec. 2 Eleventh. (See footnote, majority opinion). Now obviously these paragraphs were not intended to have the same meaning.

I particularly do not wish to be bound by the holding that an employee may not be required to make application for membership in the union in order to obtain or retain employment. If a contract be executed requiring union membership as a condition of retaining employment some means must be afforded non-union employees for indicating to the unions their wish to become members. The unions could hardly be expected to admit to membership those who were unwilling to apply therefor. The tendered contract requires, in the terms of the statute, that all employees shall, within sixty days from the date of the agreement, become members of the union as a condition of their continued employment. It seems to me that an application for membership may well be a necessary part of the mechanics for determining whether an employee wishes and is granted union membership. This is not to say that unions could include in an application, against the wish of the signing employees, pledges of conformity and promises of obedience.

Opinion delivered July 25, 1956.

MR. JUSTICE SMITH, joined by JUSTICES GRIFFIN AND MCCALL dissenting.

I most respectfully dissent. In this case the respondents, Labor Unions, in attempting to deny the petitioners-individuals, the right not to join a union are, in effect, destroying the

principle of constitutional liberty upon which their very existence is founded. The Union's effort to compel the Santa Fe to enter into the proposed contract which would ultimately bring about compulsory union membership cannot be sustained by the courts and such a contract between private parties (the unions and the Santa Fe) is not insulated from review for conformity with the Bill of Rights when *governmental action* is otherwise present. In the case of Steele v. Louisville & Nashville Railroad Co., (1944), 65 Sup. Ct. 226, 230, 89 L.Ed. 173, 323 U.S. 192, 198, 199, the United States Supreme Court said that the conduct of a labor union which is authorized by Act of Congress to function as an exclusive bargaining representative sufficiently involves the hand of government to raise questions for review under the Bill of Rights. The Court specifically said: "But we think that Congress, in enacting the Railway Labor Act and authorizing a labor union, chosen by a majority of a craft, to represent the craft, *did not intend to confer plenary power upon the union to sacrifice,* for the benefit of its members, *rights of the minority of the craft,* without imposing on it any duty to protect the minority. Since petitioner and the other Negro members of the craft are not members of the Brotherhood or eligible for membership, the authority to act for them is derived not from their action or consent but wholly from the command of the Act. * * *" (Emphasis added).

This same principle was announced in the case of American Communications Association, C.I.O. v. Douds, (1950), 339 U.S. 382, 401-402, 70 Sup. Ct. 674, 94 L.Ed. 925:

"* * * Under the statutory scheme, unions which become collective bargaining representatives for groups of employees often represent not only members of the union but nonunion workers or members of other unions as well. Because of the necessity to have strong unions to bargain on equal terms with strong employers, individual employees are required by law to sacrifice rights which, in some cases, are valuable to them. See J. I. Case Co. v. National Labor Relations Board, (1944), 321 U.S. 332, [64 Sup. Ct. 576, 88 L. Ed 762.] The loss of individual rights for the greater benefit of the group results in a tremendous increase in the power of the representative of the group—the union. But power is never the representative of the group—the union. But power is never without responsibility. And when authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself. See Graham v. Brotherhood

of Locomotive Firemen, (1949), 332 U.S. 232, 70 Sup. Ct. 14, 94 L.Ed. 173; Steele v. Louisville & N. R. Co., (1944), 323 U.S. 192, 65 Sup. Ct. 226, 89 L.Ed. 173;; Tunstall v. Brotherhood of Locomotive Firemen, (1944), 323 U.S. 210, 65 Sup. Ct. 235, 89 L.Ed. 187; Wallace Corp. v. National Labor Relations Board, (1944), 323 U.S. 248, 255, 65 Sup. Ct. 238, 241, 89 L.Ed. 216; Railway Mail Association v. Corsi, (1945), 326 U.S. 88, 94, 65 Sup. Ct. 1483, 1487, 89 L.Ed. 2072.

"We do not suggest that labor unions which utilize the facilities of the National Labor Relations Board become Government agencies or may be regulated as such. *But it is plain that when Congress clothes the bargaining representative 'with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents,'* the public interest in the good faith exercise of that power is very great." (Emphasis added).

It is by force of the "command of the Act," or authority of the Act, and that alone that the respondent-unions seek to compel the employer, Santa Fe, to enter into a contract and agreement "requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class * * *." The respondent-unions' pleadings in their motion for judgment wherein it was said, "Plaintiffs and cross-plaintiff railroad could be entitled to injunctive relief only if the objective for which Labor Union defendants were bargaining was unlawful. Congress, however, by passage of the 1951 amendment to the Railway Labor Act unequivocally settled the law applicable to this case. By removing the ban on union shop contracts which the 1934 Congress had enacted, it restored the traditional right of management and labor to enter into union security agreements." After the passage of the 1951 amendment to the Railway Labor Act, the respondent-unions began their efforts to bring about compulsory unionism. The following excerpt from one of the letters written by a vice-general chairman of one of the unions to a nonmember is typical of the attitude of the unions after they had been clothed with powers comparable to those possessed by a legislative body by the amendment of 1951, "You have probably heard through the newspapers or radio or from some other source that our organization together with sixteen co-operating organizations have filed notice upon the Santa Fe as of February 5 for negotiations to amend our agreement to

provide for the union shop and check-off system. We are quite confident that our agreement on the Santa Fe will be amended within a reasonable length of time to include provisions for a union shop. The union shop will provide that every employee in service as of the date of the signing of this agreement would be required to tender their application to our organization within sixty days after the revision is signed, or forfeit his right to work. I am sure that you are not one of the few employees who will insist that they must be forced into the organization against their will, but rather one of the employees who, through some misunderstanding or lack of knowledge to what the organization represents, or what it has done for you in the past, has failed to become a member prior to this time; * * *."

It is obvious that the respondent-unions are using the positive legislative action of Congress as a weapon to force nonmembers to join the union. It is true the Act does not say that the railroads must enter into union security agreements, but the Act, as a whole, even though it says that carriers and unions "shall be permitted to make agreements," has the legal effect and accomplishes the same purpose as though it had provided that carriers shall enter into such agreements. The Act contemplates that upon the signing of a union shop agreement all employees not then members must become members and subject themselves to the disciplinary measures of the union. The statute provides that all agreements shall contain a provision that "all employees shall become members of the labor organization representing their craft or class." Certainly the statute contemplates membership in a union. The purpose is not limited to just the payment of dues. To refuse to accede to the demands of the union could mean but one result. The nonunion member of the craft or class represented by the union bargaining agent under the principle of majority rule would be fired or, to use the words of the respondent-unions, "forfeit his right to work." This governmental action amounts to the government's "thumb" on the scales in favor of the unions and the Act of 1951 is instrumental in depriving the nonunion member of fundamental rights guaranteed by the Constitution and protected by right to work laws in Texas. In order to protect the working man as contemplated by the Constitution of the United States we must recognize that it is just as essential that the right of a man not to join a union be preserved and safeguarded as the right to join a union. By the use of the term "right to work," I do not mean it in the sense of a right to demand of an employer a particular job, or in the sense that an employee, having acquired the job, can say to the employer that he, the employee, cannot be

.discharged for cause. State right to work laws were not enacted for such purposes. The justification for such laws rest primarily on the proposition to the working man in the enjoyment of his constitutional right to work. This principle has been recognized and upheld by the courts in many suits involving the question of the constitutional right of a worker to join a union. The same principle should be applied in a case such as we have here where men desire to exercise their right of freedom of choice. To deny them this right is to destroy freedom itself. I agree with the petitioners in their statement, "If men are to be free to join unions they must also be free not to join; otherwise they have no freedom of association but a duty or obligation to join an organization selected not by themselves but by others—which is the coercion of the slave state and the very antithesis of the freedom of choice which is the core of American Constitutional liberty." See Texas & New Orleans R. Co. v. Brotherhood of Clerks, 1930, 281 U.S. 548, 50 Sup. Ct. 427, 74 L.Ed. 1034; Virginian R. Co. v. System Federation, No. 40, 1937, 300 U.S. 515, 57 Sup. Ct. 592, 81 L.Ed. 789; National Labor Relations Board v. Jones & Laughlin Steel Corporation, 1937, 301 U.S. 1, 57 Sup. Ct. 615, 81 L.Ed. 893.

Returning to the demands made by the respondent-unions upon the individual petitioners in this case, and particularly emphasizing the fact that respondents, in writing the nonunion members, as above pointed out, used the very provisions of the 1951 amendment to the Railway Labor Act. It is clear that this lawsuit springs from the wording of the statute itself. The effort to justify their acts by claiming that the staute is merely permissive and that all of their efforts are to reach a voluntary agreement between employer and union leaders and that when such contract is entered into it should be respected is merely a subterfuge to avoid the application of constitutional principles. A union shop is not, in a true sense, a voluntary arrangement. Respondents' actions in this case reveal coercive methods not only against the employees who do not desire to submit to the disciplinary power of the union and thereby sacrifice their freedom guaranteed under the Constitution and the Bill of Rights, but also are acts of coercion against the petitioners, railroads, as well. The evidence shows that the objective of respondent-unions is to ultimately force all employees to join a union, and the freedom of contract they seek is the freedom of the employer to contract with the unions that all employees must join a union. Although the respondent-unions have been designated as the bargaining representatives of their respective crafts, they completely ignore the rights of the minority, in this case the

nonunion members, and demand a contract in accordance with the terms of the statute, the 1951 amendment to the Railway Labor Act. In other words, they are advocating the converse of the right of the employer to be free to contract with employees that they would not be required to join a union. Respondent-unions are proceeding not only under the general authority of the Act, but, in addition, under the express permission given the respondents by the statute, to demand a compulsory union shop agreement.

In the case of Betts v. Easley, 161 Kan. 459, 169 Pac. 2d 831, 838, 166 A.L.R. 342, the Court said:

"In the light of the history and purpose of the (Railway Labor) Act, as construed in many decisions, the trial court's view that the acts complained of are solely those of 'a private association of individuals' is wholly untenable. The acts complained of are those of an organization acting as an agency created and functioning under provisions of Federal law. This being true, it is unnecessary to consider appellee's contention that the Fifth Amendment is not here applicable because it relates only to action by the Federal government and not to acts of private persons. Nor do we need to inquire whether appellees' statement as to the operation of the Fifth Amendment is too broadly stated. In any event the constitutional guaranties of due process, whether under the Federal or state constitutions, are to be liberally construed to effectuate their purposes, and are a restraint not only upon persons holding positions specifically classed as executive, legislative or judicial, but upon all administrative and ministerial officials who act under governmental authority. * * * While claiming and exercising rights incident to its designation as bargaining agent, the defendant union cannot at the same time avoid the responsibilities that attach to such statutory status."

The action of the respondent-unions is most assuredly subject to review by the courts because the demands are unreasonable and capricious in that the statute here involved aids the respondent-unions, who are not only bargaining representatives of union members but also of nonunion workers as well, to compel nonunion employees and employers to sacrifice rights which are valuable to them. The unions under the very terms of the Act have been given certain power and authority. This power and authority has been derived at least in part from the government—in this case the 1951 Act of Congress, the amendment to the Railway Labor Act. In fact, the 1951 amend-

ment is the only defense or justification the respondent-unions can offer for their present contentions in this case. The respondents contend that the Supreme Court of the United States did not hold that there was governmental action in the case of Public Utilities Commission of the District of Columbia v. Pollak, 1952, 343 U.S. 451, 72 Sup. Ct. 813, 820, 96 L. Ed. 1068. In my opinion, the question of governmental action was considered. The Court said in part: "It was held by the Court below that the action of Capital Transit in installing and operating the radio receivers, coupled with the action of the Public Utilities Commission in dismissing its own investigation of the practice, sufficiently involved the Federal Government in responsibility for the radio programs to make the First and Fifth Amendments of the Constitution of the United States applicable to this radio service. * * * We find in the reasoning of the court below a sufficiently close relation between the Federal Government and the radio service to make it necessary for us to consider those Amendments. * * *" The court actually passed upon the constitutional question raised in that case. It was necessary, just as it is here, for the court to do so in order to finally dispose of the case; otherwise, the court would not have passed upon the constitutional questions. See Arkansas Fuel Oil Co. v. Louisaina, 1938, 304 U.S. 197, 202, 58 Sup. Ct. 832, 82 L. Ed. 1287; Arkansas Louisiana Gas Co. v. Department of Public Utilities, 1938, 304 U.S. 61, 58 Sup. Ct. 770; Light v. United States, 1911, 220 U.S. 523, 538, 31 Sup. Ct. 485, 55 L. Ed. 570.

As heretofore pointed out, the Act invested the union with powers it did not otherwise have, and further that no common law rule renders compulsory unionism lawful, whether brought about by closed or union shop contracts. The respondents contend that the validity of the type of union shop agreement does not involve a constitutional question; that the validity of the contract desired is not tested by the provisions of the First, Fifth and Ninth Amendments to the Constitution of the United States, but that its validity rests on the common law. In support of this position respondent unions rely on such cases as Harper v. Local Union, No. 520, I.B.E.W., Texas Civ. App., 48 S.W. 2d 1033, wr. dism., and Underwood v. Texas & Pac. Ry. Co., Texas Civ. App., 1915, 178 S.W. 38, no writ history. Those cases have no application here because of the vast difference in the facts and, further, the cases involved purely private action between private parties *with no governmental action statute* involved such as we have in the case at bar. Therefore, no constitutional issues were presented for decision. The case at bar

comes within the rule that wherever government assists private parties, there is sufficient governmental action to require review under the Bill of Rights. A review of the record in this case leads to the inevitable conclusion that the respondent-unions with the aid of the 1951 amendment are attempting to accomplish that which is unlawful and violative of the rights of the petitioners. This does not contemplate an application of the present rule as announced by the United States Supreme Court that freedom rests on choice, and where choice is denied by governmental action freedom is denied as well. If this rule is applicable in racial restrictive covenant cases, then I see no reason why it should not apply in the present case where an agreement is sought which would require compulsory union membership. The ultimate result would be that the unions under the guise of security would obtain a complete monopoly and no nonunion member would ever be able to secure employment in the particular field for which he has been trained. He would be caused by such monopoly to lose not only his seniority rights gained as a result of long and faithful service, but also his right to work as well. As was said in the case of Phelps Dodge Corp. v. Labor Board, 1941 313 U.S. 177, 61 Sup. Ct. 845, 849, 85 L. Ed. 1271: "Reinstatement is the conventional correction for discriminatory discharges. Experience having demonstrated that discrimination in hiring is twin to discrimination in firing, it would indeed be surprising if Congress gave a remedy for the one which is denied for the other." That court also said, "* * * To differentiate between discrimination in denying employment and in terminating it, would be a differentiation not only without substance but in defiance of that against which the prohibition of discrimination is directed. * * *"

In the case of Lincoln Federal Labor Union No. 19129, A.F. of B. v. Northwestern Iron & Metal Co., 1949, 335 U.S. 525, 69 Sup. Ct. 251, 93 L. Ed. 212, the unions asserted "* * * 'that the right to work as a non-unionist is in no way equivalent to or parallel of the right to work as a union member; that there exists no constitutional right to work as a non-unionist on the one hand while the right to maintain employment free from discrimination because of union membership is constitutionally protected.'" The court, in rejecting this theory said in part: "* * * There cannot be wrung from a constitutional right of workers to assemble to discuss improvement of their own working standards, a further constitutional right to drive from remunerative employment all persons who will not or cannot participate in union assemblies. The constitutional right of workers to assemble, to discuss and formulate plans for furthering their

own self interest in jobs cannot be construed as a constitutional guarantee that none shall get and hold jobs except those who will join in the assembly or will agree to abide by the assembly's plans. For where conduct affects the interests of other individuals and the general public, the legality of that conduct must be measured by whether the conduct conforms to valid law, even though the conduct is engaged in pursuant to plans of an assembly."

With governmental action present, as was unequivocally held in the Hanson case by the United States Supreme Court on May 21, 1956, the record in the present case authorizes the court to issue its most gracious writ of injunction to restrain the respondent-unions from unlawfully demanding a contract which, if executed and carried out, would destroy the rights given to the petitioners under the First and Fifth Amendments. A brief review of the facts of this case demonstrates the correctness of this conclusion. The testimony of Mr. Daniel P. Loomis, Chairman of the Association of Western Railway, shows that immediately after the passage of Section 2, Eleventh, the Santa Fe, among other railroads, received a formal notice from respondents reading in so far as material as follows:

"Please accept this as formal notice served in accordance with the procedures of the Railway Labor Act on behalf of all employes we represent of our desire to make an agreement between your company and the employes represented by this organization effective thirty days after date of this letter providing as follows: 'Notwithstanding any provision in any prior agreement between the parties hereto, it is hereby agreed that (a) all employes now or hereafter employed in any work covered by the Rules and Working Conditions Agreement between the parties hereto shall, as a condition of continued employment in such work, within sixty days following the beginning of such employment or the effective date of this agreement, whichever is later, become members of, and thereafter maintain membership in good standing, in the organization party to this agreement representing their craft or class, provided that this condition shall not apply with respect to any employe to whom such membership is not available upon the same terms and conditions as are generally applicable to any other member, or with respect to any employe to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, initiation fees and assessments not including fines and penalties uniformly required as a condition of acquiring or retaining membership; * * *' "

This demand was rejected. Subsequently, on July 9, July 10, and July 31, 1952, in conferences between Mr. Loomis, representing the Santa Fe and other carriers, and respondent-unions, the unions refused to discuss any agreement under which only money payments would be made to them by non-union employees. Mr. Loomis' testimony in this respect reads as follows:

"Q. The question has been raised here in connection with the testimony of a number of witnesses as to whether the union is entitled to payment from all members of craft or class employed by the railroad for its services in acting as a collective bargaining agent.

"Was the demand of the non-operating unions for an agreement on this subject at the conference you attended or conferences that you attended, confined to one providing for the payment of fee or charge, for such services?

"A. No. It was not. As a matter of fact, the union committee stated that they would not be interested even in discussing such an arrangement.

"Q. Was the question asked of them?

"A. Yes. On July 9, 10 and 31, during the conferences in Washington, I inquired whether there was anything to be gained by discussing the proposition whereby those covered by collective bargaining agreements would contribute to the cost of collective bargaining but would not have to join a union.

"I was answered by the Chairman of the Non-operating Committee, Mr. Leighty, by Mr. Harrison of the Clerks' Union, and by Mr. Duffy of the Electrical Workers, that particularly they would not be interested in such an arrangement but they wanted a full union shop agreement whereby all employes would be required to join the Union."

Mr. Loomis further testified:

"Q. Now in these conferences that took place, did the carriers make any alternative proposal to the proposals for the union shop with the check-off?

"A. We made a direct proposal for maintenance of membership. We explored various other areas. We particularly ex-

plored, as I stated yesterday, whether there was any use in discussing any arrangement whereby employes would support the cost of collective bargaining without having to join a union.

"We discussed the United States Steel Settlement; the Western Union agreement which is what is called an agency contract where the employes do not have to join the union.

"We discussed the proposition of exempting employees now in service. The direct offer that we made, however, was a maintenance of membership arrangement.

"Q. Would you explain what is involved in that maintenance of membership arrangement?

"A. Maintenance of membership arrangement, in ordinary usage, has an escape period of possibly two or three weeks or a month during which employes have the opportunity to decide whether they want to remain members of the union or get out of the union.

"At the end of the escape period all of those who are still members of the union are required to maintain their membership in the union.

"Q. Was that substantially the proposal that the carriers made to the labor leaders?

"A. That is correct.

"Q. What response did they make?

"A. It was rejected.

"Q. You said that the carriers' conferees made a number of other proposals over this period of time. I believe you had described some of them?

"A. I put it that we explored areas of negotiation, whether there was anything to be gained by pursuing a certain line of discussion.

"Q. You mean that you put out feelers to find out what might be acceptable?

"A. Well, we asked the direct question: Now suppose that

we were to discuss making a union shop agreement but the employes now in service would be exempt; is there any use in our considering such a proposition as that? Would you be willing to talk about it? Or after the settlement was made in the steel industry, we studied that contract and explored whether there was any use to follow that up, in discussing there whether we could reach any possibility of a settlement.

"Q. Did you explain yesterday what were the essential provisions of the steel arrangement?

"A. Yes.

"Q. That was my recollection; now, what response did the union conferees make to these feelers?

"A. Just one. They wanted a full union shop agreement." The proposed contract contains Section 1 which is an absolute requirement that nonunion employees should become full union members. That Section reads as follows:

"In accordance with and subject to the terms and conditions hereinafter set forth, all employes of the carriers now or hereafter subject to the rules and working conditions agreements between the parties hereto, except as hereinafter provided, shall, as a condition of their continued employment subject to such agreements, become members of the organization party to this agreement representing their craft or class within sixty calendar days of the date they first perform compensated service —as such employes after the effective date of this agreement, and thereafter shall maintain membership in such organization; except that such membership shall not be required of any individual until he has performed compensated service on thirty days within a period of twelve consecutive calendar months. Nothing in this agreement shall alter, enlarge or otherwise change the coverage of the present or future rules and working conditions agreements."

Various other provisions contained in Sections 3-A and 3-C of this same Exhibit make it clear that the contract demanded required full union membership.

The testimony of Mr. John Landreth, one of the railroad negotiators at the conference held the day before plaintiffs filed their suit, testified that respondent unions stated that the contract in the record here as Exhibit No. 1 would be the

minimum offer, that it had been pared to the bone, and that there would be no deviation from it. The union representatives further stated that they had no authority to deviate in any way.

The petitioners, through their petition and prayer supported by evidence, are entitled to an injunction prohibiting the execution of a union shop agreement requiring full union membership. The unions demanded such a contract and threatened to strike to force its execution. The petitioners prayed for an injunction prohibiting respondent-unions from striking, and the injunction granted was warranted by the evidence in this case. The petitioners are entitled to an injunction restraining the respondent-unions from threatening or requiring compulsory union membership to the extent of the payment of dues or assessments for political purposes, or for insurance premiums, or for any purpose other than such sums as are necessary to defray each worker's share of bargaining expense. The record in this case shows that the unions in this case are political organizations as well as bargaining agencies, and that the Clerks' Union levied a political assessment against at least one worker. The recent holding of the United States Supreme Court in the Hanson case is authority for the issuance of an injunction to restrain the unlawful assessment above enumerated.

The verdict of the jury establishes that the respondent-unions demand the full union shop contract. The petitioners are entitled to an injunction in any event under the record in this case to prohibit the unions from requiring the nonunion members to take the following oath:

"I,_____, of my own free will in the presence of Almighty God and this assembly do solemnly promise and declare that I will keep sacred and inviolate this obligation and the secrets of this Brotherhood, and will not repeat outside of the lodge room any transaction whatsoever which may have taken place therein, to anyone other than those whom I know to be members in good standing."

The nonunion members, petitioners, are entitled to an injunction restraining the execution of a contract which would require them to take the oath of allegiance to the Union and to subject themselves to its laws, rules, regulations, and policies and its disciplinary powers.

The United States Supreme Court, in the course of its opinion in the Hanson case, delivered on May 31, 1956, said:

"* * * If other conditions are in fact imposed, (other than periodic dues, initiation fees and assessments) or if the exaction of dues, initiation fees, or assessments is used as a cover for forcing ideological conformity or other action in contravention of the First Amendment, this judgment will not prejudice the decision in that case. For we pass narrowly on Section 2 Eleventh of the Railway Labor Act. We only hold that the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or Fifth Amendments. We express no opinion on the use of other conditions to secure or maintain membership in a labor organization operating under a union or closed shop agreement."

The employees, being forced to make application for membership and to take the necessary oath of allegiance to the union, as above set out, become bound by its laws, rules and regulations and policies and subject to its discipline; upon an attempt on his part to resist discharge from his job, for other causes than nonpayment of dues he will be met with the well established rule of law that "a labor union has the right to make and adopt reasonable rules and by-laws governing the conduct of its members. So long as the by-laws of a union relate to matters in which no one except the association and its members is interested, and violate no right of a third person and no rule of public policy, they are valid. The articles of agreement of a labor union, whether called a constitution, charter, by-laws, or any other name, constitute a contract between the members which the courts will enforce, if not immoral or contrary to public policy or the law of the land." 31 Am. Jur. 856 and authorities there cited. Grand International Brotherhood of Locomotice Engineers v. Marshall, 1938, 119 S.W. 2d 908, wr. ref.; United Brotherhood v. Carpenters Local Union No. 14, 1943, 178 S.W. 2d 558, wr. ref., w. o. m.

State right to work laws have time and again been upheld as constitutional by the United States Supreme Court and such laws cannot be superseded or set aside except by valid constitutional enactments of the Congress. Respondent-unions assume the position that whether a man must join a union as a condition of railroad employment is a matter of *policy* to be settled by Congress, and, therefore, is beyond the province of the court. The petitioners take the position that compulsory unionism is a matter of Congressional policy if—and only if—the union shop statute is judicially determined to be within the *power* of Con-

gress. Petitioners contend that whether a statutory step is within the *power* of Congress is purely a judicial question and that this case questions the *power* of Congress to enact the union shop statute. I agree with the contention of petitioners. I cannot conceive of the United States Supreme Court holding that compulsory union membership brought into being by virtue of the 1951 amendment is possible after reading such cases as Labor Board v. Jones & Laughlin Steel Corp., supra, and Thomas v. Collins, 323 U.S. 516, 65 Sup. Ct. 516, 65 Sup. Ct. 315, 89 L. Ed. 430, and many others upholding the right of a worker to join a union. The labor unions, through the courts, have successfully maintained their position that the employer did not have the right to deprive the worker of the right to join a union. Now, it would be a sad spectacle, indeed, for the Congress to be permitted to enact a statute which would have the effect of enabling the union to drive the nonunion employees into the union or out of work.

The record in the present case is the authority for holding that "the other conditions" referred to in the Hanson opinion exist, and applying the holding in that case to the facts in the present case, and in view of its holding that governmental action was present in the Hanson case, this court should hold that governmental action was taken on behalf of the unions by Congressional action in the enactment of Section 2, Eleventh, and that such action was unlawful and unconstitutional, and in strict violation of petitioners' rights under the First and Fifth Amendments. The record in this case shows a design or pattern of procedure on the part of the respondent-unions to require a contract which would better enable the requirement of compulsory union membership, the taking of an oath that would indicate the subject was acting and speaking of his own free will, when in fact, he is acting and speaking against his will and only on compulsion, and would utimately lead to a destruction of his freedom of choice and freedom of conscience.

The judgment of the Court of Civil Appeals and the trial court should be modified, and, as modified, the injunction granted by the trial court should be affirmed.

Opinion delivered July 25, 1956.

Mr. JUSTICE McCALL, joined by JUSTICE GRIFFIN, dissenting.

I believe that the opinion of the Court of Civil Appeals

should be reversed and that of the trial court affirmed, and therefore respectfully dissent.

While this case involves the application of the First Amendment to compulsory membership in modern labor unions, the question presented is as old as American history. The First Amendment was adopted in 1791 and after a continuous struggle beginning in 1607 against compulsory membership in private organizations and compulsory support thereof. "The language of the First Amendment is to be read not as barren words found in a dictionary but as symbols of historic experience illumined by the presuppositions of those who employed them." Dennis v. United States, 341 U.S. 494, 523, 71 Sup. Ct. 857, 873, 95 Law Ed. 1137.

It will be recalled that in nine of the original American colonies an "established" church existed and was supported by public funds until the time of the American Revolution. During the first half of the seventeenth century these established churches were the most influential organizations in the lives of the colonists. Three requirements were made by law of all persons, that they (1) attend the official church, (2) pay church taxes to support the official church, and (3) subscribe to the ideology of the official church. Dissenters were persecuted and punished by the colonial governments in a variety of ways. They were fined, deprived of civil rights, imprisoned, whipped, banished, and hanged. However, the unremitting struggle against such compulsion soon compelled the established churches to make compromises such as the New England Half-Way Covenant of 1657, which required only formal membership and financial support but dispensed with the necessity of ideological conformity.

By the time of the Revolution only financial support by way of special taxes was required of those not members of the established organization. The crucial struggle came in the Virginia House of Delegates in 1784 over a bill for a "general assessment" for the maintenance of religion. No less an orator than Patrick Henry urged that since religion promotes happiness and prosperity for all, every citizen should be compelled by law to contribute to the support of the church. Proponents of the bill advanced the original form of the argument against free riders. Since all citizens benefitted from the program of the church, all should help pay therefor. (In the majority opinion and in the Hanson decision Senator Hill is quoted: " 'The question in this instance is whether those who enjoy the fruits and the benefits of the unions should make a fair contribution to

the support of the unions.' " If "churches" is substituted for "unions," it will be seen that the Senator parroted an argument long ago repudiated by Americans).

The opponents of the general assessment bill led by James Madison supported an opposition bill drafted by Thomas Jefferson, entitled Statute of Virginia for Religious Freedom, which declared in its preamble "That to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors is sinful and tyrannical." The general assessment bill was defeated and the Statute for Religious Freedom adopted in 1786, and Madison wrote Jefferson: "I flatter myself we have in this country extinguished forever the ambitious hopes of making laws for the human mind." (Apparently the gift of prophesy was not among Madison's endowments).

It was upon this issue of compulsory support of private organization that the dissenters in Virginia in 1788 led by Elder John Leland resisted the movement to adopt the proposed federal constitution until its proponents agreed to a Bill of Rights, including as its first provision of the First Amendment the guarantee that there would be no establishment of religion. It is well to remember that at the time of the adoption of the First Amendment that neither ideological conformity nor even formal Half-Way Covenant membership was any longer being demanded. The chief evil to be forever prohibited was compulsory financial support of a private organization by those who did not subscribe to its program.

Today various forms of the ideology of materialism command the allegiance and support of half the world. This ideology has its own varied organizational forms, one of which is the labor union, that in some instances exercises as great an influence over the lives of its members as did the established churches of Colonial days. By the 1951 amendment to the Railway Labor Act Congress provided for a new type of establishment suitable to the modern ideology. The authority of the federal government is enlisted in support of compulsory membership in private labor organizations and compulsory support thereof. The statute does not require ideological conformity but merely harkens back to the Half-Way Covenant and requires formal membership and financial support of the unions. In Railway Employees' Department et al v. Hanson et al., the Federal Supreme Court seems to construe the amendment, Section 2 Eleventh of the Act, as requiring not even formal membership but only that non-members pay to the organization such dues,

fees, and assessments that are reasonably allocable to the cost of collective bargaining. Thus the new Half-Way Covenant is not upheld but the taxes for the new establishment are declared not violative of the First Amendment.

The question in the present case is whether the contract demanded by the labor unions in their negotiations calls for (1) ideological conformity, (2) formal membership, or (3) financial support. Petitioners argue that the record supports the trial court findings that Respondents, the unions, are demanding a contract which provides for (1), (2) and (3). Respondents argue that "full membership" with ideological conformity is not being demanded, but only items (2) and (3). They argue that the contract in this case is literally the same as in the Hanson case, which used the words of Section 2 Eleventh of the Railway Labor Act that "all employees shall become members of the labor organization." In my opinion the contracts are not necessarily the same because some of the "labor organizations" are not the same. A contract "to become a member of the political party" will have widely different meanings as it is applied to the Democratic Party, the Republican Party, the Prohibitionist Party, and the Communist Party. Indeed, today such a contract entered into with the representative of the last party above mentioned for even formal membership in the party is so radically different that it often gets the new member into serious trouble, including expulsion from some of the above unions, or in some cases loss of employment.

Almost a score of labor organizations are here involved, varying from boilermakers to bartenders. The requirements of membership as evidenced by their constitutions and by-laws are different. There are as many different contracts here as there are labor organizations. I believe that the evidnce in this case supports the judgment of the trial court that the contracts demanded, when interpreted in the light of the record in this case, call for at least compulsory formal membership. The modern version of the ancient "test oath" set forth in the dissenting opinion of Justice Smith requires a pledge of ideological conformity for even formal membership.

The majority opinion of the Court interprets the Hanson case as sanctioning only compulsory financial support of the new establishment, and that support limited to just the collective bargaining activities of the labor organization. With this interpretation I agree but am of the opinion that the effect of the judgment in this case, in the light of the record herein, is

an extension of the rule of the Hanson case to cover at least formal membership. Judicial duty compels this Court to follow the Hanson case, but does not require us to make the slightest extension thereof.

I believe that under the Hanson case the only relationship required of the non-member to the union is that of debtor and creditor. It is the same relationship against which Jefferson, Madison and Leland fought * * * that the non-member owed the established organization for his proportionate share of the expense of the program from which he allegedly derived benefit and the state compelled payment of this debt. The unions under the Hanson case are entitled to demand that the railroad, by a check-off system, collect the debt which they claim the non-members owe them. Since the unions have demanded much more, they were properly enjoined.

Opinion delivered July 25, 1956.

Rehearing overruled December 5, 1956.