**MOBIL OIL CORPORATION et al.,
Plaintiffs-Appellees,**

v.

**OIL, CHEMICAL AND ATOMIC WORK-
ERS INTERNATIONAL UNION, AFL-
CIO, et al., Defendants-Appellants.**

No. 72–3272.

United States Court of Appeals,
Fifth Circuit.

Nov. 8, 1974.

Ainsworth, Circuit Judge, filed a dissenting opinion in which Brown, Chief Judge, and Dyer, Simpson, Morgan and Roney, Circuit Judges, joined.

Brown, Chief Judge, filed a dissenting opinion in which Dyer, Circuit Judge, joined.

Chris Dixie, Houston, Tex., for defendants-appellants.

James W. Hambright, John G. Tucker, Beaumont, Tex., Warren H. Greene, Jr., New York City, for plaintiffs-appellees.

Rex H. Reed and Michael E. Merrill, Attys., The National Right to Work Legal Defense Foundation, Inc., Washington, D. C., for amicus curiae.

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.*

THORNBERRY, Circuit Judge:

Mobil Oil Corporation Marine Transportation Department, Gulf-East Coast Operations [Company] and the Oil, Chemical and Atomic Workers International Union AFL–CIO and Maritime Local No. 8–801 of that Union [Union] entered into a collective bargaining agreement containing an agency shop clause. Shortly thereafter the company brought suit in federal district court for a declaratory judgment under section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), (c), and 28 U.S.C. § 2201, hoping that the court would find the clause violative of the Texas right to work law and thus void and unenforceable.

After a full evidentiary hearing, the district court concluded that the Texas law did apply to this employment relationship and did render the agency shop provision invalid. On appeal, a panel of this court held that a justiciable controversy existed, that jurisdiction properly vested in the district court, and that there was no abuse of discretion by that court in declining to defer to the NLRB. But on the substantive issue the panel

concluded that the district court had erred and that the agency shop clause is valid and enforceable with respect to all employees covered by the collective bargaining agreement. The panel held that the Texas right to work law does not apply to this employment relationship because these employees are not employees of Texas or of any other state, but are rather seamen whose job site is on the high seas. Because of the exceptional importance[1] and the unique nature of the question presented, we granted rehearing en banc to consider the question of the applicability of the Texas right to work law.[2]

I.

The parties to this suit, the district court, and the original panel approached the issue presented by analyzing this employment relationship in terms of its contacts with the state of Texas and other jurisdictions. It is conceded by all that employer/employee contacts with the state of Texas far outweigh contacts with any other *state,* and the evidence supporting that conclusion is neither conflicting nor ambiguous.

The company operates eight oceangoing tankers which move principally between the state of Texas and the state of New York along the East and Gulf Coasts. Since 1962, the headquarters of the company has been located in Beaumont, Texas. All personnel and payroll records are maintained there; all payroll checks are written and mailed from the Beaumont offices; all state and federal taxes are deducted from the seamen's wages in Beaumont; all monthly check-offs of Union dues for all seamen is performed in Texas; and all grievances filed on the approved grievance forms by the seamen are submitted to

---

* Judge Goldberg did not participate in the consideration of this case.

1. Five of the six states within the circuit have enacted right to work laws. Fla.Const. art. I, § 6; Ala.Code tit. 26, § 375 (1958); Ga.Code Ann. §§ 54–901 to 54–909 (1961); Miss.Code Ann. § 71–1–47 (1972); Vernon's Tex.Rev.Civ.Stat.Ann. art. 5154a, § 8a, art.

5154g, § 1, art. 5207a, § 2 (1971). All six states have coastal areas along which a large number of maritime workers are employed. 11 Hou.L.Rev. 709, 715 (1974).

2. We affirm the panel's threshold determinations of justiciability and jurisdiction for the reasons expressed in the panel opinion. *See* 5th Cir., 483 F.2d 603.

and considered by the company's manager at his office in Beaumont, pursuant to the collective bargaining agreement. The state of Texas is the only state administering unemployment compensation for the company's seamen.

The company employs 289 unlicensed seamen; 123 of the 289 have reported Texas as their state of residence; and 152 of the 289 have requested the company to list Beaumont as their shipping port. All actual hiring of seamen occurs in Texas. While approximately 40% of the seamen first make application in New York and 60% make application in Beaumont, the final hiring decision is made only in Beaumont. As many as 60% of the applicants actually come from the Texas labor force. Furthermore, all terminations of seamen are finalized in Beaumont as a result of decisions made at the Beaumont headquarters. The evidence suggests that from the seaman's first encounter with the company to his last, the Beaumont headquarters is constantly in the picture.

The above contacts demonstrate that the state of Texas is intimately involved with this employment relationship. And the district court was clearly correct in its finding that a more substantial part of the administration and performance of the collective bargaining agreement occurs in Texas than in any other state.[3] We think it not insignificant to note that this "justiciable controversy" arose in Beaumont, for it was in the context of the hiring process there that the Union and the company began this battle.[4]

The panel, however, believed that the predominance of Texas contacts with this employment relationship was not decisive. Instead, the panel concluded that the determinative factor in deciding whether the Texas law is applicable is job situs. The record indicates that the seamen spend 80% to 90% of their working time on the high seas. Each seaman works roughly a 120 day cycle consisting of 90 days aboard ship and 30 days ashore "on vacation" during which shore time he continues to be an employee of the company and to receive wages. The panel's theory is that, with so much of a seaman's working time reserved for the high seas, the Texas law, and for that matter the law of any state, is rendered inapplicable. The panel does not explain, however, why job situs is the singularly most significant, indeed the decisive, factor.[5]

 Rather than adopt the panel's limited approach, we choose to weigh all

3. The only other state which arguably has any interest in this employment relationship is New York. Of the company's seamen, 60 have reported New York as their state of residence. The collective bargaining agreement was first negotiated and executed there. That agreement was prepared in final form and re-executed in Texas. The agreement does not contain a choice-of-law provision. On this record, it is undisputed that Texas has quantitatively and qualitatively greater contacts with this employment relationship than does any other state, including New York.

4. The company dealt the first blow by notifying all new seamen that it would not enforce the agency shop provision. The union response was sharp: "As far as this Union is concerned, any employee in our Division of Mobil must either join our Union or pay dues to the Union. We intend to exercise our right to have the employment of any unlicensed seamen terminated who does not join or pay dues to the Union."

5. Two 1949 NLRB decisions furnish the focus of the panel's argument. In Western Electric Co., Inc., 84 NLRB No. 111, and Northland Greyhound Lines, Inc., 80 NLRB No. 60, the Board was called upon to determine appropriate bargaining units for employees who performed their work in many states, some of which prohibited union security agreements. The Board recommended separate units which would be subject to the laws of the respective states according to the employee's job situs. The issue raised in those cases, however, was not whether some state law applied to the employment relationship but *which* state law applied, thus aborting the question with which we are now faced. As the panel noted, neither the Board nor the court has ever been faced with the precise issue now before us. *See* Seafarers International Union of North America, Atlantic, Gulf, Lakes & Inland Waters District et al., 202 NLRB No. 91; Mobil Oil Corp. v. Oil, Chemical and Atomic Workers Int. U., 5th Cir. 1973, 483 F.2d 603, 608.

of the contacts in the context of our national labor policy. We disagree with the panel's conclusion that job situs has some talismanic quality. We would agree with the panel opinion that the district court's finding that a more substantial part of the administration and performance of the collective bargaining agreement occurs in Texas than in any other state is not decisive. The number of contacts is a highly relevant consideration, but the true importance of these contacts is to be understood not in a quantitative vacuum but in the qualitative background furnished by the Congress.

Whether the agency shop clause in this collective bargaining agreement is valid or not depends entirely upon whether the Texas right to work law applies to this employment relationship.[6] In determining whether the Texas law is applicable, we must decide whether it was the intent of Congress in writing section 14(b) to permit a state to apply its right to work law to an employment relationship which has contacts with the state as described by the evidence presented to the district court.

Our task is made more difficult by the fact that there is nothing in the legislative history of the Taft-Hartley Act which expressly answers our question one way or the other. Nevertheless, we must determine as best we can what Congress would have intended on this point had it been presented for their explicit consideration.[7] Our job is not to add up all of the contacts and to decide which jurisdiction has "the most." Our task is to discern whether application of the Texas right to work law would be in furtherance of the Taft-Hartley Act's expressed purposes.[8] *See* National Woodwork Mfrs. Ass'n v. NLRB, 1967, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357; Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 1968, 389 U.S. 463, 468, 88 S.Ct. 643, 646, 19 L.Ed.2d 705; NLRB v. Metallic Bldg. Co., 5th Cir. 1953, 204 F.2d 826, 828. And in arriving at a just, proper, and congressionally authorized conclusion, we invoke the eclectic approach of Chief Justice Marshall:

> Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived . . .

United States v. Fisher, 1805, 2 Cranch (6 U.S.) 358, 386, 2 L.Ed. 304, 313; *see also* United States v. Dickerson, 1940, 310 U.S. 554, 562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356.

Having done so, we conclude that it was not the intent of the Congress to prevent Texas from applying its right to work law in the context of this employment relationship. Indeed, in our judgment, application of the Texas law would be in furtherance of our national labor policies. For the reasons expressed below, we hold that the federal labor legislation, the predominance of Texas contacts over any other jurisdiction, and the significant interest which Texas has in applying its right to work law to this employment relationship warrant application of the Texas law and, consequently, invalidation of the agency shop provision.

---

6. It is undisputed that the agency shop is a form of union security which is proscribed by the Texas law, and the Texas Attorney General has so ruled. Opinion WW–1018.

7. "The difficulties of so-called interpretation arise when the Legislature has had no meaning at all; when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine what the Legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present." John Chipman Gray, Nature and Sources of the Law: Statutes, p. 173 (1921 ed.)

8. "[I]t is one of the surest indexes of a mature and developed jurisprudence . . . to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Judge Learned Hand, in Cabell v. Markham, 2nd Cir. 1945, 148 F.2d 737, 739, aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165; *see also* Federal Deposit Ins. Corp. v. Tremaine, 2nd Cir. 1943, 133 F.2d 827, 830.

## II.

We begin with "the language of the statute itself." Jones v. Alfred H. Mayer Co., 1968, 392 U.S. 409, 420, 88 S.Ct. 2186, 2193, 20 L.Ed.2d 1189. Sections 7 and 8(a)(3) of the Labor Management Relations Act, 29 U.S.C. §§ 157, 158(a)(3), specifically authorize employers and labor organizations to enter into union shop agreements by whose terms membership in a union, after a short waiting period, is required as a condition of employment.[9] The Supreme Court has interpreted these sections to authorize an agency shop, a form of union security conditioning employment on the payment of regular union dues and initiation fees in lieu of actual union membership. NLRB v. General Motors Corp., 1963, 373 U.S. 734, 738–739, 83 S.Ct. 1453, 10 L.Ed.2d 670; Retail Clerk's Inter. Ass'n v. Schermerhorn [*Schermerhorn I*], 1963, 373 U.S. 746, 751, 83 S.Ct. 1461, 1464, 10 L.Ed.2d 678.

In the same stroke, section 8(a)(3) was redrafted to prohibit the closed shop which its predecessor section, section 8(3) of the National Labor Relations Act, had permitted. H.R.Conf.Rep.No. 510, 80th Cong., 1st Sess. 60, 1 Leg. Hist.L.M.R.A. 545, U.S.Code Cong.Serv. 1947, p. 1135. The closed shop differs from the union shop in only one regard: the closed shop requires that the job applicant be a member of the union before he is hired. 11 Hou.L.Rev. 709, 710, n. 7 (1974).

Section 14(b) of the Act, 29 U.S.C. § 164(b), provides:

Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

By enacting this provision, Congress desired to "make certain" that section 8(a)(3) of the Act could not "be said to authorize arrangements of this sort [compulsory unionism] in States where such arrangements were contrary to the State policy." H.R.Conf.Rep.No. 510, supra, 1 Leg.Hist.L.M.R.A. at 564; *Schermerhorn I*, supra; U.S.Code Cong. Serv. 80th Cong., 1st Sess.1947, p. 1135. The language of section 14(b) as well as its legislative history suggests an intent on the part of the Congress to save to the states the right to prohibit the practical equivalents of compulsory unionism, including the agency shop. *Schermerhorn I*, supra; Retail Clerks Inter. Ass'n v. Schermerhorn, 1963, 375 U.S. 96, 98, 84 S.Ct. 219, 220, 11 L.Ed.2d 179 [*Schermerhorn II*]; NLRB v. Houston Chap., Asso. Gen. Con. of America, Inc., 5th Cir. 1965, 349 F.2d 449, 453.

The national labor policy expressed in these sections of the Taft-Hartley Act is one which directly authorizes union shop arrangements, but only in those states which have not passed the right to work

---

9. 29 U.S.C. § 157:
 "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."
 29 U.S.C. § 158:
 "(a) It shall be an unfair labor practice for an employer—

* * * * *

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . ."

laws. In a sense, a conflict between state and federal law may thereby arise

but it is a conflict sanctioned by Congress with directions to give the right of way to state laws barring the execution and enforcement of union-security agreements . . .

*Schermerhorn II,* supra, 375 U.S. at 103, 84 S.Ct. at 222, 11 L.Ed.2d at 184. In essence, the congressional judgment is that state right to work laws are in harmony with, and part of, the national labor policy.

The district court focused its attention on the "application" of the agency shop clause requiring the payment of dues and fees "as a condition of employment in" Texas. Believing that the collective bargaining agreement received its most significant application in Texas, the district court concluded that the Texas law applied. The panel, however, began with the premise that state right to work laws are applicable only to employees of those particular states and concluded that the employees in this case are not for the purpose of their collective bargaining agreement employees of Texas or any other state because of their job situs. Fortunately, Congress has given us some indication of the approach it would favor.

When the Congress prohibited the closed shop while permitting the union shop in the Taft-Hartley Act, the Congress was demonstrating its concern with the process by which men and women were hired. As conceived by that legislative body the closed shop enabled union hiring halls to control absolutely the pool of labor available to an employer. H.R.Rep.No. 245, 80th Cong., 1st Sess., 1 Leg.Hist.L.M.R.A. 295, 300. The hiring decision was, in effect, made by the union hiring hall, for the employer never saw a job applicant unless the applicant had been referred by the union, and of course, only union members were referred. The Congress singled out the maritime industry as a serious problem area.[10] The legislative history of the Act exhibits an express intent to give to the employer some measure of freedom in the hiring process. *See* H. R.Rep.No.245, supra; *see also, e. g.,* 93 Cong.Rec. A1297 (1947) (remarks of Representative Gerald Landis) and 93 Cong.Rec. A2011 (1947) (remarks of Representative Hugh Meade), infra at note 11. The union shop agreement permits an employer to hire a person who has not, at or before the moment of hiring, joined the union. With the proscription of the closed shop, union hiring halls are now required to refer job applicants on a nondiscriminatory basis, so that an employer may consider non-union applicants on an equal basis with union applicants. NLRB v. Houston Chap., Asso. Gen. Con. of America, Inc., supra. In short, if the congressional discussion on compulsory unionism could be said to have any single reference point, it is not job situs but the hiring process.[11]

10. " . . . It is clear that the closed shop which requires preexisting union membership as a condition of obtaining employment creates too great a barrier to free employment to be longer tolerated. In the maritime industry and to a large extent in the construction industry union hiring halls now provide the only method of securing employment. This not only permits unions holding such monopolies over jobs to exact excessive fees but it deprives management of any real choice of the men it hires. Extension of this principle to licensed deck and engine officers has created the greatest problems in connection with the safety of American vessels at sea. . . .

"Under the amendments which the committee recommends, employers would still be permitted to enter into agreements requiring all the employees in a given bargaining unit to become members 30 days after being hired . . . " S.Rep.No.105, 80th Cong., 1st Sess., 1 Leg.Hist. 412–413.

11. " . . . For the last 14 year. as a result of labor laws ill-conceived and disastrously executed, the American w-kingman has been deprived of his dignity as an individual. He has been cajoled, coerced, intimidated, and on many occasions beaten up, in the name of the splendid aims set forth in section 1 of the National Labor Relations Act. His whole economic life has been subject to the complete domination and control of unregulated monopolists. He has on many occasions had to pay them tribute to

And in our judgment, the language of section 14(b) which looks to the "execution or application" of agreements requiring membership as a condition of employment refutes the notion that Congress was suddenly singularly concerned with the job situs of the employee rather than with the effects of such an agreement on men and women seeking employment in a mobile society.[12] The language and history of section 14(b) suggest that a state may apply its right to

get a job. He has been forced into labor organizations against his will . . . He has been denied any voice in arranging the terms of his own employment. . . ." H.R. Rep.No.245, supra, 1 Leg.Hist. L.M.R.A. 295.

" . . . The bill bans the closed shop. Under carefully drawn regulations it permits an employer and a union voluntarily to enter into an agreement requiring employees to become and remain members of the union a month or more after the employer hires them or after the agreement is signed . . . Under this clause, employers may select their own employees . . ." *Id.*, at 300.

" . . . *Section 8(a)(3)*.—In the language of the present act, this section forbids employers to discriminate in regard to the hire and tenure of employees or any term or condition of employment to encourage or discourage membership in any labor organization. Consistently with court decisions, the bill expressly makes this clause applicable to persons seeking employment, thereby banning 'black lists.' " *Id.*, at 321.

"Section 8(a)(3): The proviso to this section has been redrafted to abolish what is narrowly termed the 'closed shop.' An employer is permitted to make agreements requiring membership in a union as a condition of employment applicable to employees in a given bargaining unit 30 days after an employee is hired. . . ." S.Rep.No.105, 80th Cong., 1st Sess., 1 Leg.Hist. 426.

"I prefer the union shop to the closed shop because the employer is free to hire non-union workers and is the sole judge of the qualifications of the applicants. Union membership may be acquired immediately following employment or within a stipulated period thereafter. . . ." 93 Cong.Rec. A1297 (1947) (remarks of Representative Gerald Landis).

"The closed shop would be outlawed.

"But a union shop would be authorized under certain circumstances. Under the union shop, an employer may hire anyone of his choosing, but that person must become a member of the shop union within a given period, usually 30 days . . .

"Under this provision an employer may select his own employees and the employee has 30 days to decide whether he or she cares to join the union . . ." 93 Cong.Rec. A2011 (1947) (remarks of Representative Hugh Meade).

*See also* Cox, The Labor Management Relations Act, 61 Harv.L.Rev. 274, 297 (1948).

12. H.R. 3020, as it passed the House, permitted union shop agreements "if such provisions are not in conflict with the law of any State in which the agreement is to be carried out . . . " *See* 1 Leg.Hist. L.M.R.A. 183–84. The original House version of the provision which found its final form in § 14(b) was unclear as to the scope of a state's power over union security agreements. *See* 1 Leg.Hist. L.M.R.A. 207–08. The House Committee Report on H.R. 3020, however, interpreted the provision as authorizing union shop agreements "only if they are valid under the laws of any State in which they are to be performed."

During the debate on the House version of the bill, passing reference was made to the McCarran Act, 15 U.S.C. § 1011 et seq., in which Congress declared that the activities of insurance companies were subject to state regulation, notwithstanding the interstate and even international character of the insurance business. *See* 93 Cong.Rec. 3621 (1947) (remarks of Representative Case). While the legislative history of the McCarran Act suggests an intent to limit the extraterritorial application of state laws, there is nothing to that effect in the legislative history of the Taft-Hartley Act. Moreover, the McCarran Act has been interpreted to permit regulation by the state in which the insurance practice has its "impact" or "operative force." *See, e. g.,* FTC v. Travelers Health Ass'n, 1960, 362 U.S. 293, 301, 80 S.Ct. 717, 722, 4 L.Ed.2d 724; United States v. Chicago Title and Trust Co., N.D. Ill.1965, 242 F.Supp. 56, 66; *see also* American Hospital and Life Ins. Co. v. FTC, 5th Cir. 1957, 243 F.2d 719, 724, aff'd, 1958, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540; State Bd. of Insurance v. Todd Shipyards Corp., 1962, 370 U.S. 451, 82 S.Ct. 1380, 8 L.Ed.2d 620; Prudential Ins. Co. v. Benjamin, 1946, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342. And the Supreme Court has permitted state regulation of maritime insurance contracts which clearly have an extraterritorial effect. Wilburn Boat Co. v. Fireman's Fund Insurance Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337; Toomer v. Southwest Casualty Insurance Co., S.D.Tex. 1964, 231 F.Supp. 542, 543; Irwin v. Eagle Star Insurance Co., 5th Cir. 1972, 455 F.2d 827, 829–830.

work law whenever the state has a significant interest in the process by which a union security agreement is applied. No one disputes the fact that this agency shop agreement receives its application in Beaumont, Texas. Indeed, it is the company's resolute refusal to apply the agreement in Beaumont, Texas, that has caused this suit.

The preamble to the Texas right to work law records the legislative judgment that because unions exercise great influence over the economic well-being and freedom of the Texas labor force, the state has an important interest in removing union coercion from the hiring process.[13] Each of the Texas right to work provisions expresses a concern with that process. Article 5207a, § 2, provides: "No person shall be denied employment on account of membership or nonmembership in a labor union." Article 5154a, § 8a provides: "It shall be unlawful for any labor union, . . . to collect . . . any fee . . . whatsoever, as a work permit or as a condition for the privilege to work from any person not a member of the union. . . ." And, lastly, article 5154g, § 1, provides that " . . . the right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union." Again, if any single legislative focus can be discerned from the Texas provisions, it is not job situs or the place of job performance but the hiring process. Thus one triggering point for the application of these provisions is hiring within the state. As indicated

earlier, this is consistent with the language and intent of section 14(b).

If, as we have noted, the Texas laws were enacted to afford the Texas labor force protection from compulsory unionism, the fact that as many as 60% of the job applicants come from the Texas labor force gives Texas good reason for applying its right to work provisions. But the state's interest goes far beyond its predominant association with the hiring process and its numerous other contacts with this employment relationship which have already been listed. During the one-fourth of the year when the employees are "on vacation" in Texas, they presumably have homes and families; they pay taxes; they send their children to school; they eat, sleep, and move about; they act like other citizens of the state. In short, they are precisely the people whom the Texas law was designed to protect.

The high seas definitely have contact with the employees, but what is the interest of the high seas in preventing application of the Texas law? How is some important non-Texas, national, or international policy furthered by refusing to apply the Texas law? The fact that maritime work is interstate, or even international, in character does not imply that the Texas law is inapplicable since federal regulation in these matters is predicated upon interstate commerce. No one who studies the legislative history of section 14(b) can seriously argue that Congress intended to permit the states to prohibit compulsory unionism only in those instances where interstate commerce was not affected.[14] Conse-

13. Vernon's Ann.Civ.St. art. 5154a, § 1, provides in part:

"Because of the activities of labor unions affecting the economic conditions of the country and the State, entering as they do into practically every business and industrial enterprise, it is the sense of the Legislature that such organizations affect the public interest and are charged with a public use. The working man, unionist and nonunionist, must be protected. The right to work is the right to live." See Lunsford v. City of Bryan, 1957, 156 Tex. 520, 297 S.W.2d 115; Texas Federation of Labor v. Brown &

Root, Inc., 246 S.W.2d 938 (Tex.Civ.App.—1952, writ ref'd n. r. e.) ; Sheet Metal Workers Local No. 175 v. Walker, 236 S.W. 2d 683 (Tex.Civ.App.—1952, writ ref'd).

14. " . . . [B]y section [14(b)] the United States expressly declares the subject of compulsory unionism one that the State may regulate . . . notwithstanding that the agreements affect commerce . . . " H. R.Rep.No.245, 80th Cong., 1st Sess., 1 Leg. Hist. L.M.R.A. 325.

"My understanding is that the basis of this legislation, constitutionally speaking, is the

quently, there is no uniformity principle at stake here since a national or international union may have a union shop in one state and find that arrangement prohibited in another by the state law.[15]

The panel opinion suggested that allowing Texas to apply its right to work law here would allow an employer to make an "arbitrary choice," could produce "bizarre consequences," and could defeat the purposes of sections 7, 8, or 14(b) of the Act. On the contrary, as the legislative history indicates, allowing Texas to apply its laws here is in furtherance of the national labor policy expressed in the Act and in furtherance of the Texas legislative judgment. Furthermore, the panel's fear that employers might choose headquarter locations in states with right to work laws and thereby defeat national labor policy is, on this record, unfounded. First, the employer's headquarters is not the decisive factor, any more than job situs is. To reiterate, we have chosen to weigh all of the employer and employee contacts in the context of our national labor policy. Secondly, the Union has never even alleged that Mobil moved to Texas in order to seek the shelter of the Texas right to work law. We will have time enough to consider that factor in the proper case. We should note; however, that employers may set up their opera-

tions anywhere they choose, incurring the responsibilities and gaining the advantages of that locale as they do so. The Union has directed us to no language in section 14(b) or its legislative history which suggests that a company cannot freely choose to establish a substantive enterprise in a right to work state for the purpose of obtaining the benefit of the state's law.

It is the antithesis of the method we use here to permit an employer to make a truly arbitrary choice of the state law to be applied. The applicability of a state right to work law will depend upon whether such application would further the policies and purposes of our national labor laws. For example, where an employer has artifically constructed its operations or its hiring process in such a way that the substance of its activities occurs in and the greatest part of its labor force comes from a non-right to work jurisdiction while a pro forma final hiring decision is made in a right to work state, application of the state's right to work law would be contrary to the national labor policy. We are not faced with that circumstance here.

Moreover, we see no bizarre consequences flowing from the method used or the result reached today. Yet refusing to allow Texas to apply its law here would create the bizarre consequence of

commerce clause of the Constitution, authorizing the Federal Government to regulate commerce between the states. Throughout the entire history of such legislation that has been its basis.

"This measure does not affect wholly intrastate commerce and persons who are engaged in intrastate commerce, rather than interstate commerce. The provision of the measure which exempts any State from the operation of its provisions, if such State has outlawed the closed shop, therefore in effect adopts the State as the agency through which the regulation of interstate commerce shall take place, insofar as the closed shop is regulated." 93 Cong.Rec. 6679 (1947) (remarks of Senator Barkley) ; see also 93 Cong.Rec. 6614 (1947) (remarks of Senator Morse) and 93 Cong.Rec. 3621–22 (1947) (remarks of Representatives Barden, Hoffman, Jennings, and Case).

15. "By making the matter one of state law, Congress has not only authorized multiformity on the subject, but practically guaranteed it." Amalgamated Ass'n of St., E.R. & M.C. Emp. v. Lockridge, 1971, 403 U.S. 274, 317, 91 S.Ct. 1909, 1933, 29 L.Ed.2d 473, 500 (Mr. Justice White, dissenting).

" . . . [I]n one important area the bill expressly abandons the principle of uniform application of national policy under Federal law. The bill's stated policy of preserving some degree of union security would be abdicated in all States where more restrictive policies exist. In other respects the bill makes clear that Federal policy would govern insofar as activities affecting commerce are concerned. This is not only an invitation to the States to distort national policy as they see fit, but is a complete forsaking of a long-standing constitutional principle." President Truman's Veto Message, 93 Cong. Rec. 7500 (1947).

exempting the maritime industry from the operation of section 14(b). We have found nothing in the legislative history or the language of any present labor legislation, and the Union has directed us to none, which suggests an intent on the part of the Congress to create a special rule for maritime workers. On the contrary, the legislative history of the Taft-Hartley Act indicates that Congress was aware of the problems in the maritime industry caused by compulsory unionism and sought to deal with them. *See* S.Rep. No. 105, 80th Cong., 1st Sess., 1 Leg.Hist. 412–413; footnote 9, supra.

In the past, when Congress has decided to supersede section 14(b) and state right to work laws, it has done so expressly. Prior to 1951, the Railway Labor Act, 45 U.S.C. § 151 et seq., prohibited union shop agreements. But in 1951, Congress amended the Act to permit carriers covered by the law and their employees to enter into union shop agreements

> [n]otwithstanding any other provisions of this Act, or of any other statute or law of the United States, or Territory thereof, *or of any State.*

45 U.S.C. § 152, subd. 11 (emphasis added). Fully aware of the Taft-Hartley Act and its section 14(b), Congress used express language in the 1951 amendment precisely to defeat application of state right to work laws. Railway Employees' Dept. v. Hanson, 1956, 351 U.S. 225, 232, 76 S.Ct. 714, 718, 100 L.Ed. 1112; *see also* Sams v. Brotherhood of Railway and Steamship Clerks, 4th Cir. 1956, 233 F.2d 263, 264; Inter. Ass'n of Machinists v. Sandsberry, Tex.Civ.App.1954, 277 S.W.2d 776, 780–781, aff'd, 1956, 156 Tex. 340, 295 S.W.2d 412, cert. denied, 1957, 353 U.S. 918, 77 S.Ct. 669, 1 L.Ed.2d 665. In our judgment, this instance of congressional action demonstrates that state right to work laws are not to be ignored unless the language or legislative history of the federal law

permits such a course.[16] Railway Employees' Dept. v. Hanson, supra. State prohibition of compulsory unionism is a "congressional dispensation of grace, not the imperious right of a state," and thus Congress has always had the power to exempt seamen from the operation of state right to work laws. SeaPAK v. Industrial, Technical & Pro. Emp., Natl. Maritime Union, S.D.Ga.1969, 300 F. Supp. 1197, 1201, aff'd, 5th Cir. 1970, 423 F.2d 1229, aff'd, 1971, 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434; Railway Employees' Dept. v. Hanson, supra. But it has chosen not to do so.

If we were to carve out an exception for seamen here, in the absence of any suggestion to do so from Congress, we would be encroaching on the legislative authority. That course of action, in spite of Justice Cardozo's frank observation that judge-made law is "one of the existing realities of life," is beyond our constitutional prerogatives. *See* Cardozo, The Nature of the Judicial Process (1921 ed.), p. 10.

### III.

Alternatively, the Union contends that it is improper to strike out the agency shop clause in its entirety from the collective bargaining contract since some of the seamen have greater contacts with states other than Texas, states without right to work laws. The Union asks that we fashion a rule which renders the Texas right to work law inapplicable to those employees who have greater contracts with non-right to work states than with Texas. We decline the Union's invitation for two reasons.

The agency shop clause in the collective bargaining contract states:

> For the duration of the Agreement all employees hired shall, as a condition of employment, become members of the Union and/or in the alternative pay the regular union dues and initia-

16. For the history of the Railway Labor Act and the 1951 amendment, *see* Inter. Ass'n of Machinists v. Street, 1961, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141; Railway Employees' Dept. v. Hanson, supra.

tion fees within 31 days from the employment date.

This clause unambiguously demands that all employees hired join the union or pay the required fees. The clause makes no distinctions between job applicants who are to be protected by the Texas law and those who are not. As the panel majority noted, we cannot rewrite the contract to reflect these allegedly distinguishable classes.[17]

Secondly, even if we could rewrite the contract, on this record we are unwilling to hold that there is an identifiable group of employees who are not subject to the Texas law. The Union's brief admits that "the record before the court was insufficient to enable the court" to authorize partial application of the agency shop provision. Since we are not the fact-finders in the judicial process, we have no basis for implementing the Union's alternative request.

IV.

We have attempted a multi-dimensional analysis of the question presented for our disposition. On one level we have examined this employment relationship in terms of its contacts with the state of Texas and other jurisdictions. On another we have studied Congress' actions in passing the Taft-Hartley Act and the 1951 amendment to the Railway Labor Act in order to give meaning and context to the undisputed contacts. On still a third level we have scrutinized the interests of different jurisdictions in applying their laws to this employment relationship.

The resulting matrix offers a clear picture. Texas is intimately involved with this employment relationship. Texas has a more significant interest in applying its law than does any other jurisdiction. And the federal labor legislation suggests a congressional intent to allow Texas to apply its law, rather than to exempt the maritime industry from the operation of section 14(b). Having exhausted, as best we can, the reality before us, we are faced with but one result.

The judgment of the district court is affirmed.

AINSWORTH, Circuit Judge, with whom BROWN, Chief Judge, and DYER, SIMPSON, MORGAN and RONEY, Circuit Judges, join (dissenting).

The question for decision is important and of first impression: Whether Texas' right-to-work statutes are applicable to the agency shop clause in a collective bargaining agreement involving mobile maritime employees—in this case, seamen employed on vessels operating on the high seas, whose work is performed entirely outside the State of Texas.[1]

---

17. *See* Perry Coal Co. v. NLRB, 7th Cir. 1961, 284 F.2d 910, 914; Lewis v. Quality Coal Corp., 7th Cir. 1959, 270 F.2d 140, 142; Fentress Coal & Coke Co. v. Lewis, 6th Cir. 1959, 264 F.2d 134, 135–136; NLRB v. News Syndicate Co., Inc., 2nd Cir. 1960, 279 F.2d 323, 328.

1. The highly controversial nature of so-called right-to-work laws is well known. No subject of labor relationship between employers and unions causes greater bitterness. Without attempting here to take sides on this troublesome issue, a few of the pros and cons will serve to demonstrate the heat which is engendered when the subject of such laws is raised.

For example, the "free rider" issue is hotly disputed:

The unions claim that the worker who refuses to join the union is a free rider, since the union is obliged by law to bargain for the entire work force. The nonmember gets all the benefits of union representation without paying dues. Management retorts that the nonunion member under a right-to-work law is not a free rider, but a forced rider, since the union demands that it bargain for the entire work force. The union, in turn, maintains that the law must provide, as it does, for the union to represent all workers, union and nonunion, for if each worker were able to bargain individually, the employer could discriminate against the union by maintaining two wage scales—one for the union and a higher one for nonunion workers. Under this arrangement it would not be long before the union would be mustered out of the plant.

Once again, the important consideration is not whether the nonunion worker is a

The majority concedes that neither the National Labor Relations Board nor the Court has ever been faced with the precise issue before us and that nothing in the legislative history of the Taft-Hartley Act expressly answers our question. It also concedes that the district court's finding that a more substantial part of the administration and performance of the collective bargaining agreement occurs in Texas than in any other state is not decisive and that the number of Texas contacts, while relevant, is likewise not determinative. It proceeds nevertheless to "weigh all of the [Texas] contacts in the context of our national labor policy" and devotes the greater part of its opinion to an academic dissertation on our national labor policy, congressional intent and the benefits foreseen by Congress in banning the closed shop, thereby allowing a greater

measure of freedom to both employee and employer in the hiring process. The treatise, though interesting, is not relevant to the issues here.

There is no dispute about what Congress did when it enacted the Taft-Hartley Act and included therein section 14(b) which authorizes a state, at its option, to enact so-called right-to-work laws. Pursuant to this provision, Texas passed such laws. The question to be determined is not the validity of such legislative enactments, but whether they are applicable to the collective bargaining agreement in this case. Unfortunately, by focusing on uncertain legislative history rather than on the precise issue of whether federal or state law should apply to the employment contracts of maritime workers performing no work in any state,[2] the majority fi-

free rider or a forced rider, but what the workers believe the case to be. When nonunion employees work side by side with union employees there is bound to be friction if the union workers believe the nonunion workers are free riders. This friction runs counter to the aim of our national labor policy, which places industrial stability as its prime objective.

Marshal, "Right-to-Work," Pro and Con, 17 Lab.L.J. 131, 136–137 (1966). As to more general aspects of the controversy, see also Dempsey, The Right-to-Work Controversy, 16 Lab.L.J. 387, 388 (1965), as follows:

An analysis of the campaigns to pass right-to-work laws usually shows that there is a vast difference of viewpoint on the interpretation of the meaning of these laws between opponents and proponents of the laws. Before the public, the advocates of the right-to-work laws take what might be called a contractual viewpoint. They aim to prevent a clause in the labor management contract which would make membership in a union a condition of employment. In their minds, the issue is as simple as that. To make a man become a union member or forfeit his job or right to work is regarded as un-American and dictatorial. In fact, according to this view, unions would be stronger the more voluntary they were.

The opponents of the right-to-work laws marshall their arguments based not on the contractual approach but on what might be called the integral viewpoint of the law.

According to the union, collective bargaining, unionism and union security (closed shop or union shop) are a unity. An attack on one is an attack on all. Moreover, union security usually involves at least three additional activities: organization, collection of dues and some form of job control. The union in its campaign to stop these laws usually claimed that their true purpose was to restrict some or all of these activities.

2. The evidence shows that the collective bargaining agreement was negotiated and executed in New York; that since 1942 labor contracts for the employee unit involved here have been negotiated in New York and that present negotiations for a successor contract have been occurring in New York. Mobil's corporate headquarters remain in New York, and prior to 1962 its Marine Transportation Department was likewise headquartered there. Information extracted from vessel logs shows that of the eight tankers operated by the company, five of them making typical trips touching the port of Beaumont for a period of time in May and June 1972 were in that port only 5.5% of the total time. A sixth vessel did not touch the Texas port during that period of time and part of July 1972. Many of the trips bypass Texas completely. For example, eight times a year a vessel travels from the East Coast to Puerto Rico and returns. At the time of the trial one of the vessels was en route to Guam on a 6-month charter,

nesses the issue and ignores the impact of the central dispute in this case.

It is undisputed that the combined effect of sections 7 and 8(a)(3) of the Labor Management Relations Act, as interpreted by the Supreme Court,[3] and section 14(b) of the Taft-Hartley Act is to recognize the validity of an agency shop except in those states which prohibit them. The majority points out that Congress in passing section 14(b) carved out no exception for seamen. What the majority fails to discern, however, is that seamen have traditionally maintained an exceptional status in regard to the regulation and control of their employment, and that section 14(b) cannot reasonably be construed to remove them from that category. Seamen, particularly the type of blue-water seamen involved here, as wards of admiralty have been accorded a special status and protection under federal maritime law unknown to state law in the domain of the master-servant relationship.[4] Unlike the land-based worker, the seaman's employment and all of the rights and restrictions flowing therefrom, are determined by federal statutory and admiralty law, not state law. Hiring, discharge and various terms of employment are regulated by shipping articles mandated by federal statute.[5] Compensation to seamen for illness, injury, disability and death is provided through the unique admiralty doctrine of maintenance and cure,[6] and by special federal statutory enactments such as the Jones Act[7] and the Death on the High Seas Act.[8] Federal maritime law covers the gamut of a seaman's employment relationship, including wages,[9] maritime liens for the collection therefor,[10] the protective pro-

and had not been in a Texas port for 50 days. All of the vessels are located on the high seas or in non-Texas ports 80% to 90% of the time; 57% of the seamen are residents of states other than Texas.

3. NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963); Retail Clerk's Inter. Ass'n v. Schermerhorn, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963).

4. See, e. g., Garrett v. Moore-McCormack, 317 U.S. 239, 246–248, 63 S.Ct. 246, 251–252, 87 L.Ed. 239 (1942); Socony-Vacuum Co. v. Smith, 305 U.S. 424, 430–431, 59 S.Ct. 262, 266, 83 L.Ed. 265 (1939); The Arizona v. Anelich, 298 U.S. 110, 122–123, 56 S.Ct. 707, 711–712, 80 L.Ed. 1075 (1936); Warner v. Goltra, 293 U.S. 155, 162, 55 S.Ct. 46, 49, 79 L.Ed. 254 (1934). Contractual matters have been specially scrutinized in order to protect seamen. "Our national legislature and the courts of admiralty have given particular expression to the wardship theory in matters relating to seamen's contracts." Norris, The Seaman as Ward of the Admiralty, 52 Mich.L.Rev. 479, 487 (1954).

5. 46 U.S.C. §§ 563–568.

6. The liberality of the remedy afforded by this ancient doctrine when compared to workmen's compensation acts is shown in the following passage from Norris, The Law of Seamen, Vol. 1, 2d Ed., § 575:

A seaman becomes entitled to maintenance and cure by showing that his injury or illness arose while he was in the service of the ship. The injury or illness need not arise out of his employment and the right to the remedy is irrespective of contributory negligence unless due to his own willful misbehaviour. A land worker who seeks an award under most compensation acts must show that the disability was caused by accidental injury or by an occupational disease. Under the general maritime law an illness which manifests itself during the period of employment (although perhaps an aggravation of a preexisting condition, the seriousness of which was not known to the seaman) entitles him to recover the cost of his maintenance and cure until the maximum cure is reached. The illness may be nothing more serious than a simple cold, but if it disables the seaman to an extent that he cannot resume his employment, he is entitled to be paid for his expenditures for medicines, nursing care and the cost of maintaining himself. Moreover, the per diem rate presently allowed to seamen for the cost of maintenance and cure is generally on a more liberal scale than that accorded by compensation. Finally, a seaman is entitled to the cost of his maintenance and cure immediately following the onset of his illness or injury, whereas compensation laws generally include a hiatus prior to the accrual of weekly payments.

7. 46 U.S.C. § 688.

8. 46 U.S.C. §§ 761–768.

9. 46 U.S.C. §§ 682–685.

10. 46 U.S.C. § 953.

cedures against attachment and assignments of wages,[11] the rights accorded seamen to receive at every port half of unpaid wages earned[12] and double payment for wages withheld without sufficient cause,[13] physical qualifications and requirements for seaman,[14] and disciplinary problems.[15] In no employment field is the master-servant relationship so predominantly controlled by federal maritime law than in that existing aboard ship between the master of the vessel and the men who man it. Indeed, it does not appear that there is any aspect of the employment relationship which Texas law may properly control —except, of course, for the novel injection of Texas' right-to-work law into the present labor contract. In practical effect, state regulation of this employer-employee relationship stops at the water's edge.

The majority opinion places much emphasis on the legislative history of the Taft-Hartley Act, concluding that it indicates great concern with the hiring process and a willingness to substitute state law for federal standards where appropriate. Congress was in truth con-

cerned about the adverse impact of compulsory unionism on the hiring process, but section 14(b) was not, as the majority suggests, designed to be the remedy for these ills. Section 14(b) was inserted into the Taft-Hartley Act merely to restate preexisting law, not to expand the jurisdiction of states relative to employment conditions involving maritime workers, traditionally the subject of federal law. The National Labor Relations Act (Wagner Act) itself was not intended to override state laws regulating the closed shop.[16] Congressional amendment of what is now section 8(a)(3) of the Labor Management Relations Act, 29 U.S.C. § 158(a)(3), not the inclusion of section 14(b), was the chief tool designed to alleviate the perceived evils of compulsory unionism.

A careful reading of the legislative history of the Taft-Hartley Act shows that Congress felt that section 8(a)(3) would curb problems in the hiring process by removing prior union membership as an employment prerequisite and by providing that expulsion from a union would not necessitate discharge from employment so long as initiation fees or dues were not delinquent.[17] Senator

11. 46 U.S.C. § 601.

12. 46 U.S.C. § 597.

13. 46 U.S.C. § 596.

14. 46 U.S.C. § 672.

15. 46 U.S.C. §§ 701–710.

16. In its report on the N.L.R.A., the Senate committee stated that "the bill does nothing to facilitate closed-shop agreements or to make them legal in any State where they may be illegal." S.Rep.No.573, 74th Cong., 1st Sess. 11 (1935); see also H.Rep.No. 1147, 74th Cong., 1st Sess. 19–20 (1935); S.Rep.No.105, 80th Cong., 1st Sess. 6 (1947), 1 Leg.Hist. L.M.R.A. 412. In explaining to Congress the reason for section 14(b)'s inclusion, the conferees for the Taft-Hartley Act stated as follows:
It was never the intention of the National Labor Relations Act, as is disclosed by the legislative history of that act, to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither of the so-called "closed shop" proviso in section 8(3) of the existing act nor the union shop and maintenance of membership pro-

viso in section 8(a)(3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy. To make certain that there should be no question about this, section 13 was included in the House bill. The conference agreement, in section 14(b), contains a proviso having the same effect. House Conf.Rep.No. 510, 80th Cong., 1st Sess. 60 (1947), 1 Leg.Hist. L.M.R.A. 564, U.S.Code Cong.Serv. p. 1166. See also H. Rep.No.245, 80th Cong., 1st Sess. 44 (1947), 1 Leg.Hist. L.M.R.A. 335.

17. After reiterating some of the problems of the closed shop, the Senate Report on the Taft-Hartley Act detailed the remedial provisions contained in present section 8(a)(3) and concluded:
It seems to us that these amendments remedy the most serious abuses of compulsory union membership and yet give employers and unions who feel that such agreements promoted stability . . . the right to continue such agreements. (Emphasis added.)
S.Rep.No.105, 80th Cong., 1st Sess. 7 (1947), 1 Leg.Hist. L.M.R.A. 413.

Taft noted in debate that a prime example of problems generated by the closed shop was in the West Coast shipping industry.[18] He then outlined the changes that would be made by section 8(a)(3) and, with no reference whatever to section 14(b), concluded that the abuses in the hiring process would thereby be corrected.[19] Congress did indeed single out the maritime industry as a serious problem area, as noted by the majority opinion (*ante*, p. 277 & n. 10). The cited provisions of the legislative history, however, make no reference to section 14(b) as a palliative for these problems; rather, the amendments to section 8(a)(3) were deemed fully capable of solving these problems.[20] Since the agency shop provision before us avoids the evils in the hiring process Congress was trying to correct, and since it is clearly valid under section 8(a)(3), it cannot be validly concluded that enforcement of this provision is contrary to federal labor policy.[21]

The majority opinion bases its holding on (1) the predominance of Texas contracts, (2) federal labor legislation, and (3) the significant interest which Texas has in applying its right-to-work laws. The consistent and traditional control by federal law of every phase of maritime employment relationships and contracts refutes the proposition that Employer's contacts with Texas[22] justify injecting state law into federal maritime affairs. As to federal labor policy, it is clear from the previous discussion that the agency shop provision in question in the present contract is totally consistent with Congress' desire for a fair hiring process. Moreover, whatever Texas' interest may be in applying its law to this contract, the State of Texas has not been sufficiently concerned either to invoke its laws itself or to intervene in these proceedings. Employer is seeking to avoid its own labor contract by vicarious assertion of Texas law. In any case, the admitted premise that the agency shop clause of the labor contract is in contravention of the law of Texas does not permit the conclusion that a clause contained in a New York contract and affecting employment performed solely outside of the State of Texas is invalid.

The result which the majority reaches in this case is somewhat impractical. The attempt of the Court, at the behest of Mobil Oil Company, to give extraterritorial effect to Texas' right-to-work laws fails both in soundness and in logic. Here the majority has taken an employment relationship, traditionally one in admiralty, regulated in virtually all aspects by federal maritime law, involving seamen who are wards of admiralty, and has subjected this employment to state labor laws when none of the employees works in the state. How this can be done where all of the seamen's work is aboard vessels plying the high seas, and where most (57%) do not even reside in Texas, is not explained. Under the circumstances, the majority's conclusion is neither practical nor realistic.

In my view, the original majority panel decision in this case is correct and should be reaffirmed. Under the circumstances, I dissent.

---

18. 93 Cong.Rec. 3952 (1947), 2 Leg.Hist. L. M.R.A. 1010.

19. *Id.* at 3952–3953, 2 Leg.Hist. L.M.R.A. 1010–1011.

20. S.Rep.No.105, 80th Cong., 1st Sess. 6–7 (1947), 1 Leg.Hist. L.M.R.A. 412–413; see the quotation from this passage in n. 17, *supra*.

21. In any case the majority opinion does not fully explain how Congress could fairly be said to have intended that a New York employee of Mobil, who resides in a state where his employment contract was entered into and where agency shop provisions are permissible, and who performs no work whatever in Texas, should be prohibited by Texas law from enjoying the benefits of an agency shop provision in his employment contract.

22. The great bulk of the contacts with Texas recited by Employer and the majority are relationships between *Mobil* and Texas. Insofar as the workers are concerned, it is conceded that they perform no work in Texas, and that fewer than half are residents of Texas.

JOHN R. BROWN, Chief Judge, in which DYER, Circuit Judge, joins, concurring in the dissent of Judge AINSWORTH:

Because I think this is an ideal case for the exercise of the primary jurisdiction by the NLRB, I would rather see this Court defer its decision and require the parties to present to the Board for its determination the issue—whether the Texas right to work provisions should apply under the 14(b) exception to § 8(a)(3) of the National Labor Relations Act to this agency shop contract. Since the Court is not so disposed, I concur fully without reservation in the dissent.

The Court's opinion misplaces the emphasis of the Taft-Hartley Act [1] and this flaw in the ointment pervades the entire opinion. After tallying the almost due process-type contacts between the administration of the union agreement and the state of Texas, the Court rejects the job situs formula [2] in favor of this multiple contacts rule because it finds direction in the legislative history of the National Labor Relations Act. In addition, the Court finds persuasive evidence for its conclusion from the fact that the Texas right to work law was designed to proscribe precisely this kind of agency shop agreement and to apply to these kinds of workers. [3]

After first agreeing that the legislative history of the statute has no express answers for this problem (see Court opinion page 273), the Court concludes that the job situs doctrine is, in any case, an improper rule of thumb because the intent of Congress in adopting the Taft-Hartley Act was to eliminate the much-abused *hiring* monopoly of the closed shop system. But the fallacy here —as pointed out by the dissent—is that the adoption of § 14(b) was unrelated to this goal. Instead, it was § 8(a)(3) of the Labor Management Relations Act [4] that served this purpose.

1. 29 U.S.C.A. § 151.

2. Northland Greyhound Lines, Inc., 80 NLRB No. 60 (1948); Western Electric Co., Inc., 84 NLRB No. 111 (1949).

3. This argument appears to beg the question. Undoubtedly Texas right to work laws do apply to employment relations within the state but whether these seamen fit that category is precisely the question here.

4. 29 U.S.C.A. § 158(a)(3) that reads:
 (a) It shall be an unfair labor practice for an employer—
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
 In addition to eliminating serious abuses of compulsory unionism, the legislative history indicates that Congress sought to "ensure the equal financial contribution of all employees who share in the benefits of union accomplishments through collective bargaining." 11 Hous.L.Rev. 709, 711 (1974).

Section 8(a)(3) expressly sanctions as a matter of federal policy union shop agreements with the important limitation that such agreements will not be valid "as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."[5] While noting this "tension" between federal and state policy, the Court starts and finishes with the tacit assumption that the Court must find *some* applicable state law—almost in a conflicts-of-law analysis. The basis for that assumption is in no way discernible from the Act itself or its legislative history. Instead, the emphasis of the Act is that union security agreements are of such importance that absent state proscription outlawing union shop employment relationships within that state, they will be favored. The job situs rule, though never before applied in precisely this situation,[6] is merely a logical distillation of § 14(b). For that

reason I think we should follow it here as did the panel.[7]

Although I do concur fully in the dissenting opinion of Judge Ainsworth, under the circumstances I believe that it would be better administration and more consistent with sound legal principles for the Court to refer this case to the NLRB under the doctrine of primary jurisdiction. This is so because essentially the question here is whether state right to work amendments should be applied to this union contract under the National Labor Relations Act. The Supreme Court has approved [8] and this Court [9] has committed itself to this procedure repeatedly under various circumstances.

Two of the most significant instances were FPC cases where we ordered reference to the Commission for it to decide whether it had jurisdiction over the sale and purchase of royalties.[10] The Commission held that it did. It then went to the D.C. Circuit where it determined

5. 29 U.S.C.A. § 164(b) (1973).

6. In its attempt to distinguish the previous job situs cases, the Court makes what appears to be an erroneous distinction. While it is true that *Northland Greyhound Lines, Inc.* and *Western Electric Co.* (see note 2, *supra*) were concerned with the application of state right to work laws to workers employed in *more* than one state, in order to determine which state's law should apply to a multi-state contract, some state had to meet the criteria of 14(b). For that reason it is irrelevant whether the Board was selecting among several competing states or determining the appropriate application of one state's law. Therefore, we should consider the formula developed by the Board in those cases for they are highly relevant to the case at bar.

For example, in *Northland* the "headquarters of the employees * * * the focal points of the employment relationship" were defined as a place "where employees report to work, receive their instructions, and are paid their salaries." One benefit of this test, noted by the Board was that it would diminish the extraterritorial effect of the laws of any one state. 80 NLRB 288, 291 (1948). Also, in *Western Electric Co.* the NLRB applying this *Northland* test determined that the employees would be considered headquartered at their job site. 84 NLRB 1019, 1022 (1949).

7. Mobil Oil Corp. v. Oil, Chemical and Atomic Workers International Union, 5 Cir., 1973, 483 F.2d 603.

8. Mitchell, Cole & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472; General American Tank Car Corp. v. El Dorado Terminal Co., 1939, 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361; United States v. Western Pacific R.R. Co., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126; Far East Conference v. United States, 1951, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576; Southwestern Sugar & Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 79 S.Ct. 1210, 3 L.Ed.2d 1334, 1959 AMC 1631.

9. Agricultural Transportation Association of Texas v. King, 5 Cir., 1965, 349 F.2d 873; Carter v. American Telephone & Telegraph Co., 5 Cir., 1966, 365 F.2d 486, 497; River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1958, 253 F.2d 922, 1958 AMC 1534 (after remand, 5 Cir., 1960, 274 F.2d 36, 1960 AMC 2064); Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84; J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104.

10. Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84, 102–103; J. M. Huber Corp. v. Denman, 5 Cir., 1966, 367 F.2d 104, 111–112.

that the FPC was in error and did not have jurisdiction.[11] The significant thing here is that a Court may, and often should refer basic statutory construction problems—including even the agency's jurisdiction—to the agency for its initial determination as to its own jurisdiction.

In addition the *Southwestern Sugar & Molasses Co.* case [12] is instructive on the scope and use of primary jurisdiction. There this Court referred an issue on the construction of the Interstate Commerce Act to the ICC. While the Supreme Court reversed this procedure because it thought that other issues should be reached first, they affirmed expressly in a very elaborate opinion that our primary jurisdiction reference was entirely proper and within the Court's power.[13] On remand the panel decided it on the merits and reached a result that made consideration by the administrative agency unnecessary.[14]

Primary jurisdiction is particularly invaluable for this case because, however, one may view the merits, it is acknowledged that the record below is inadequate to enable this Court to determine what, if any, partial remedies would be appropriate. (See Court's opinion page 281). Where 57% of the employees covered by this agreement are not Texas residents, further findings of fact and exploration of alternative remedies would certainly appear to be mandated. No matter how it is sliced the Court is trying to divine congressional policy for a situation never before faced in accommodating § 8(a)(3) and § 14(b). That policy should first be explored by the agency charged with responsibility for administering the Act which contains as an integral part the quasi-judicial machinery for hearing and deciding cases by formal opinions which, until overruled by a competent Court,

become as authoritative as the words of the Act.

It is not abdication—indeed it is performance of judicial duty in the highest sense—for us to defer to the NLRB the initial determination of the interpretation of the Act under the circumstances of this industrial situation.

11. Mobil Oil Corp. v. FPC, D.C.Cir., 1971, 149 U.S.App.D.C. 310, 367 F.2d 256, cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L. Ed.2d 676.

12. 253 F.2d 922, 1958 AMC 1534.

13. Southwestern Sugar & Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 421, 79 S.Ct. 1210, 3 L.Ed.2d 1334, 1959 AMC 1631.

14. 5 Cir., 1960, 274 F.2d 36, 1960 AMC 2064.